**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                   :
TARIQ MAQBOOL,                     :
                                   :
         Plaintiff,                :  CIVIL ACTION NO. 11-4592 (MLC)
                                   :
     v.                            :     O P I N I O N
                                   :
UNIVERSITY HOSPITAL OF MEDICINE &  :
DENTISTRY OF NEW JERSEY, et al.,   :
                                   :
         Defendants.               :
_____   :
```

**COOPER, District Judge**

Plaintiff, a prisoner confined at New Jersey State Prison
("NJSP"), brought a civil action in state court against Defendants:
(1) University of Medicine and Dentistry of New Jersey ("UMDNJ");
(2) Correctional Medical Services ("CMS"); (3) New Jersey
Department of Corrections ("DOC"); (4) former Commissioner George
Hayman; (5) current Commissioner Gary Lanigan; (6) Dr. Jose
Fuentes; (7) Dr. Alan Martin; (8) Dr. Ronald Schliftman; (9) Dr.
Abu Ahsan; (10) Nurse Patricia Voss; (11) Nurse Donique Ivey;
(12) Dr. Ihuoma Nwachukwu; (13) Warden Michelle Ricci; (14) a
certain Joanne Howell; (15) Assistant Superintendent Christopher
Holmes; (16) Nurse Brown; (17) Dr. Glick; and (18) ten
unspecified "John/Jane Doe(s), 1-10". (See dkt. entry no. 1-1.)

On August 9, 2011, Lanigan filed a Notice of Removal. (See
dkt. entry no. 1.) By September 29, 2011, three filings reflected
appearances by UMDNJ, Ahsan, Howell, Nwachukwu, and Brown. (See
dkt. entries nos. 4, 5, 6.) On October 13, 2011, Plaintiff filed

a document purporting to operate as a notice of claim required by state law.  (See dkt. entry no. 7.)

CMS appeared in the action on October 27, 2011.  (See dkt. entry no. 10.)  Plaintiff filed a letter on the same day opposing removal, alleging that he commenced his action in state court on June 22, 2011, verifying that he was still striving to serve all defendants, and requesting appointment of counsel.  (See dkt. entry no. 11.)  On October 28, 2011, Plaintiff sought entry of default against Ricci, Hayman, Holmes, Voss, and Ivey, asserting that he "mailed summons and a copy of [his] complaint" to Ricci and Hayman by "inter-department" mail, and to Holmes, Voss, and Ivey by "prison institutional mail."  (Dkt. entry no. 12.)

Glick filed an Answer on November 3, 2011.  (See dkt. entry no. 14.)  Plaintiff moved for remand on November 9, 2011, arguing that his knowledge of state law was better than that of federal law.  (See dkt. entry no. 15.)  Defendants, inter alia, argued in opposition that (1) removal was proper, and (2) Plaintiff could litigate this action pro se since he had filed papers and motions, his command of English was such that he tutored English to others, and he averred that he had extensively studied pertinent state law governing the bulk of his claims and took additional training in legal research.  (See dkt. entry no. 23.)

Brown, Howell, Lanigan, DOC, and UMDNJ moved to dismiss the Complaint on December 9, 2011.  (See dkt. entry no. 24.)  Plaintiff then filed a motion wherein he conceded that he failed to file a

2

timely notice of claim required by state law, and sought leave to
file such notice out of time. (See dkt. entry no. 25.)  On
December 20, 2011, CMS also moved to dismiss the Complaint.  (See
dkt. entry no. 26.)  The parties then filed additional papers
concerning the pending motions and requests.  (See dkt. entry
nos. 29, 34, 36, 39, 40, 42 and 43.)

The Magistrate Judge denied Plaintiff's requests for
counsel.  (See dkt. entry no. 41.)  Now, for the reasons detailed
below, (1) the Complaint will be dismissed, and (2) the requests
for remand, entry of default, and to file a late notice of claim
will be denied.

## I.  BACKGROUND

The Complaint lists events taking place since 2005.  (See
Compl. at 10.)  According to Plaintiff, on an unspecified date
in "late 2005", he fell and hurt his right wrist while playing
soccer in the prison gym.  (See id. ¶ 23.)  He attributed his
fall to the condition of the gym floor.  (See id.)  He maintains
that, after the fall, a certain Jane Doe examined his wrist, gave
him pain-reducing medication and informed him that, in order to
be diagnosed and treated, his wrist had to be x-rayed.  (See id.
¶ 24.)  According to the Complaint, the wrist was x-rayed in
March 2006, and Fuentes assessed the x-ray concluding that the
wrist appeared normal.  (See id. ¶ 25.)

Plaintiff asserts that, in mid-2006, he met Ricci during a
public reception and informed her that, about a year prior, he

fell in the gym because of a defect in the floor, and Ricci
promised to "look into that matter." (See id. ¶ 27.)

Plaintiff also asserts that, because he kept complaining
about pain in the wrist to unspecified individuals, another x-ray
was conducted in July 2006, and a hairline fracture was detected.
(See id. ¶¶ 28-30.)   The diagnostic report of that second x-ray
was produced by Schliftman and Martin; the report did not direct
a follow-up diagnostic procedure, such as an MRI.  (See id. ¶
31.)  Plaintiff was not informed about the hairline fracture
diagnosis and, instead, he was directed by an unspecified John
Doe to treat the wrist with ice.  (See id. ¶¶ 32-35.)

But Plaintiff concedes that in 2008, upon being examined by
Ivey, he was informed that the wrist had a hairline fracture.
(See id. ¶ 36.)  As Plaintiff kept complaining about wrist pain,
in June 2008 an MRI was performed, which verified the existence
of the hairline fracture, and Plaintiff was supplied with a wrist
wrap and referred to an orthopedic surgeon.  (Id. ¶¶ 38-39.)  A
surgeon examined Plaintiff also in 2008 and recommended surgery
out of concern that Plaintiff could develop complications in the
event he develops arthritis; Plaintiff, therefore, had the wrist
operated on in 2008.  (See id. ¶¶ 40-42.)  He asserts that the
surgeon recommended a post-surgical casting of the wrist and
physical therapy.  (See id. ¶ 43.)

Plaintiff's wrist was set in a cast after surgery.  The cast
was removed by Glick in either April or May 2009, and allegedly

during the process of removing the cast, Glick (a) speculated that the wrist might have healed on its own had it been placed in a cast right after the injury, and (b) informed Plaintiff that some loss of maneuverability of the wrist might remain, although this loss might be diminished by physical therapy. (See id. ¶¶ 44-49.) Plaintiff, therefore, requested physical therapy.  (Id. ¶ 52.)

Plaintiff further alleges that another x-ray of the wrist was conducted in January 2009, and Ivey signed the diagnostic report assessing what the x-ray disclosed.  (See id. ¶ 50.)  One more x-ray was conducted in April 2009, and Ahsan executed a diagnostic report on the basis of that x-ray.  (See id. ¶ 53.)

Plaintiff asserts that he again requested physical therapy and, on an unspecified date in 2008 or 2009, was "scheduled to go to the clinic", apparently to have a meeting with Ivey about his requests for physical therapy.  But Ivey did not see Plaintiff and merely advised him, through Brown, that he needed no physical therapy.  (See id. ¶ 55.)  Consequently, Plaintiff complained about Ivey's findings and requested physical therapy by means of an official remedy form; in response to this grievance, he was informed that physical therapy was deemed unnecessary by a "physician".  (See id. ¶¶ 56-57.)  Since Ivey and Brown were nurses, Plaintiff filed an appeal asserting that the "physician" to whom he spoke last was Glick, and Glick recommended to him to explore the benefits of physical therapy.  (See id. ¶ 58.)

Plaintiff's wrist was x-rayed again in August 2009, and he was indeed scheduled for physical therapy. (See id. ¶¶ 59-60.) According to Plaintiff, during the therapy sessions, a therapist speculated that the therapy might have been more effective had it been administered right after the surgery. (See id. ¶¶ 62-64.)

Plaintiff received a response in December 2009 as to his appeal requesting physical therapy (that is, his appeal filed before Plaintiff began receiving the therapy); the response was issued by Holmes and stated, correctly, that – by the time of Holmes's response – Plaintiff had already received physical therapy. (See id. ¶¶ 65-68.)

Plaintiff maintains that he is now being denied a support wrap for the wrist by unspecified individuals. He also alleges that he was receiving pain-reducing over-the-counter medication in November 2010 from unspecified individuals without being provided with a warning as to potential side effects, and – upon Plaintiff's inquiry – Ahsan recommended to him to reduce intake of these medications in the event they cause Plaintiff an irritated bowel. (See id. ¶¶ 70-76; compare ¶ 79.)

Plaintiff's final allegations pertain to events on November 2 through November 4, 2010, when (a) he allegedly asked a nurse not named as a Defendant in this action for a "soft cuff" to wrap the wrist to protect it during Plaintiff's trip to a state court, (b) the soft cuff was allegedly not provided, and (c) the wrist

6

allegedly suffered swelling and pain because he was handcuffed during the trip.  (See id. ¶¶ 79-84.)

The Complaint closes with Plaintiff's statement that, as of now, the gym floor is still not fixed and "is hardly ever cleaned."  (See id. ¶ 86.)

## II.  PARTIES' POSITIONS

### A.  Plaintiff's Claims

Plaintiff asserts breach of contract as an intended third party beneficiary by CMS and UMDNJ, as these entities failed to fulfil their contractual obligations to DOC; medical malpractice by CMS, UMDNJ, Fuentes, Martin, Schliftman, Howell, Nwachukwu, Ivey, Ahsan, Brown, Glick, and the Doe defendants; negligence; deliberate indifference ensuing from the condition of the gym floor; deliberate indifference ensuing from Plaintiff's medical treatment; "breach of N.J. Stat. Ann. § 30:4-91.1 [and] N.J. Admin. Code § 10A:16"; "unspecified" causes of action (paraphrasing the negligence claim); "Title 42 U.S.C. § 1986"; intentional infliction of emotional distress; "State constitutional claim"; "federal constitutional tort"; "State constitutional tort"; and fraud.  (Id. at 19-51.)

#### 1.  Claims Facially Without Merit

Plaintiff has no standing to sue either CMS or UMDNJ for an alleged breach of contract with DOC.

> Plaintiff has no standing to sue for such violation: this is so even if Plaintiff deems or designates himself as a third-party beneficiary of this contract. See Brown v.

7

Sadowski, 2009 U.S. Dist. LEXIS 62718, at *13 (D.N.J. July 20, 2009) ("Plaintiff has no standing to seek enforcement of any duties his prison officials might owe to the state, since Plaintiff is not an expressly designated third party beneficiary of the contracts, if any, that the state might have with the prison officials") (relying on Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006)); accord Glenn v. Hayman, 2007 U.S. Dist. LEXIS 20092, at *34 (D.N.J. Mar. 20, 2007) (analogously relying on Anza for the observation that, "[s]ince the State of New Jersey was the allegedly defrauded party (and in no way designated Plaintiffs to litigate the alleged RICO claim on behalf of the State), Plaintiffs cannot bring this claim").

Parker v. Gateway Nu-Way Found., 2010 U.S. Dist. LEXIS 115116, at *14-15 (D.N.J. Oct. 26, 2010); see Binkley v. Rendell, 2012 U.S. Dist. LEXIS 10795, at *15-16 n.5 (M.D. Pa. Jan. 30, 2012) (same).

Plaintiff also has no claim for "federal constitutional tort" other than his 42 U.S.C. § 1986 claim. If Plaintiff intended to rely on the Federal Tort Claims Act, such a claim is unavailable, since there are no federal defendants. See 28 U.S.C. § 1346. Furthermore, to the extent Plaintiff sought to raise "State constitutional claims" or "State constitutional tort" falling outside the New Jersey Tort Claims Act ("NJTCA"), such challenges are duplicative of the Section 1983 claims, and will be addressed as Section 1983 claims only.

N.J.S.A. § 30:4-91.1 and N.J.A.C. § 10A:16, both cited by Plaintiff, are wholly inapposite to his circumstances and claims, since Section 30:4-91.1 pertains to "the power to transfer inmates from one institution to another," Gibson v. Lynch, 652 F.2d 348, 354 (3d Cir. 1981), and no private cause of action arises under Section 10A:16. See Ali v. D.O.C., 2008 U.S. Dist.

8

LEXIS 96061, at *22-23 (D.N.J. Nov. 19, 2008) (stating DOC
Commissioner promulgated the regulation in accordance with
Estelle v. Gamble, which provides constitutional basis for claim
for failure to provide medical care, and thus plaintiff had no
separate private cause of action under N.J.A.C. § 10A:16).

      **2.   Remaining Groups of Plaintiff's Causes of Action**

     The Court will address the remaining claims in clusters as
follows: (a) constitutional challenges asserting deliberate
indifference; (b) state-law personal injury claims; and (c)
state-law negligence challenges, such as medical malpractice.

    **B.   Defendants' Arguments**

     Defendants collectively assert that the claims are untimely
and that the constitutional challenges fail to state a claim.
Brown, Howell, Lanigan, DOC and UMDNJ separately assert DOC was
improperly named as a Defendant; claims against UMDNJ and Lanigan
are insufficient being based solely on the theory of respondeat
superior; and the state law claims are procedurally defective and
insufficient.  Glick additionally asserts that Plaintiff's
allegations did not pertain to him.

**III. STANDARD OF REVIEW**

    **A.   Summary Dismissal**

     The Court must identify cognizable claims and sua sponte
dismiss any claim that is frivolous, is malicious, fails to state
a claim upon which relief may be granted, or seeks monetary relief
from a defendant who is immune from such relief. See 28 U.S.C. §

1915(e)(2)(B).  The Court must be mindful to construe a <u>pro</u> <u>se</u>
complaint liberally in the plaintiff's favor in determining its
sufficiency.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (2007)
(citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976), and <u>Haines v.</u>
<u>Kerner</u>, 404 U.S. 519, 520-21 (1972)).  But a complaint must
contain "a short and plain statement of the claim showing that
the pleader is entitled to relief," and "[a] pleading that offers
[merely] 'labels and conclusions' or 'a formulaic recitation of
the elements of a cause of action will not do.'"  <u>Ashcroft v.</u>
<u>Iqbal</u>, 556 U.S. 662, 677-78 (2009) (relying on <u>Bell Atl. Corp. v.</u>
<u>Twombly</u>, 550 U.S. 544, 555 (2007)).  Therefore, "threadbare
recitals of the elements of a cause of action, supported by mere
conclusory statements, do not suffice," and "only a complaint
that states a plausible claim for relief survives.  . . .
Determining whether a complaint states a plausible claim for
relief . . . requires the reviewing court to draw on its judicial
experience and common sense.  [W]here the well-pleaded facts do
not permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged - but it has not 'show[n]'
- that the pleader is entitled to relief.'"  <u>Iqbal</u>, 556 U.S. at
678-79 (cites omitted).

   **B.  Analysis**

   When screening the Complaint pursuant to § 1915(e)(2)(B),
the Court must accept all factual allegations contained therein

as true, construe the claims in the light most favorable to Plaintiff, and determine whether Plaintiff may be entitled to relief.  See Courteau v. United States, 287 Fed.Appx. 159, 162 (3d Cir. 2008); Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000); Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999); see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  The Complaint must "state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678 (cites and quotes omitted).

## IV.  DISCUSSION

### A.  Complaint Violates Rules 18 and 20

Rule 20(a)(2) of the Federal Rules of Civil Procedure limits the joinder of defendants, while Rule 18(a) governs the joinder of claims.  See Fed.R.Civ.P. 18(a), 20(a)(2).

Rule 18 (a) provides: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."  Fed.R.Civ.P. 18(a).  But Rule 20(a)(2) provides: "Persons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of

11

transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a)(2).  Thus, all claims must be transactionally related and involve a common question of law or fact.  See Fed.R.Civ.P. 20(a)(2).  Specifically, a prisoner may not join in one case all defendants against whom he may have a claim, unless he satisfies the requirements of Rule 20(a)(2):

> [M]ultiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, [so] to prevent the sort of morass that this 50-claim, 24-defendant suit produced . . . . A buckshot complaint that would be rejected if filed by a free person - say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions - should be rejected if filed by a prisoner.

George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007).

The Complaint, which Plaintiff asserts was filed on June 22, 2011, is a diary spanning 2005 to November 2010.  (See dkt. entry no. 11.)  While the allegations pertaining to Plaintiff's alleged injury of his wrist and the following medical treatment could be arguably combined into a chain of claims meeting the requirements of Rules 18 and 20, Plaintiff's final groups of challenges (pertaining to his allegations about the November 2010 denial of a "soft cuff" during his transportation to a state court, the denial of a support wrap, and the current failure to maintain the gym floor) cannot be grouped into his original chain of claims.

12

These latter claims will be dismissed without prejudice to raising them by means of a distinct and separate civil complaint.[1]

The Court, therefore, will address only the claims concerning injury of the wrist and defective medical treatment taking place between 2005 and November 2010.

**B.   Statute of Limitations**

Civil rights claims are governed by the applicable state's statute of limitations for personal injury actions.  See Wilson v. Garcia, 471 U.S. 261, 280 (1985).  Accordingly, New Jersey's two-year limitations period on personal injury actions governs such claims.  See N.J.S.A. § 2A:14-2; Montgomery v. DeSimone, 159 F.3d 120, 126 & n.4 (3d Cir. 1998); Cito v. Bridgewater Township Police Dep't, 892 F.2d 23, 25 (3d Cir. 1989).  Under N.J.S.A. § 2A:14-2, an action for an injury to the person caused by a wrongful act, neglect, or default must be brought within two years of accrual.  See Cito, 892 F.2d at 25.

New Jersey law sets forth certain bases for "statutory tolling."  See, e.g., N.J.S.A. § 2A:14-21 (tolling for minority or insanity); N.J.S.A. § 2A:14-22 (tolling for nonresidency of

---

[1]   The Court expresses no opinion as to the substantive or procedural validity or invalidity of these claims.  But the Court notes that – if Plaintiff raises such claims before November 2012 – these claims could be timely within the meaning of the applicable two-year statute of limitations, which, in turn, means that Plaintiff would not be disadvantaged by the Court's dismissal of his claims violating Rules 18 and 20.  Also, the Court advises Plaintiff that he may bring the distinct and separate action in state court, where it may remain if he refrains from raising federal claims therein.

persons liable).  New Jersey law also permits "equitable tolling" where "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," or where a plaintiff has "in some extraordinary way" been prevented from asserting rights, or where a plaintiff has timely asserted rights mistakenly either by defective pleading or in the wrong forum.  See Freeman v. State, 347 N.J.Super. 11, 31 (N.J. App.Div. 2002).  "However, absent a showing of intentional inducement or trickery by a defendant, the doctrine of equitable tolling should be applied sparingly and only in the rare situation where it is demanded by sound legal principles as well as the interests of justice."  Id.

None of the available tolling options appear to apply to Plaintiff's pleading.  Thus, his constitutional challenges warrant no equitable tolling and are governed strictly by the two-year limitations period.

Medical malpractice claims also must be commenced within two years of the alleged negligence.  See N.J.S.A. § 2A:14-2.

The Complaint states that Plaintiff fell and injured his wrist in 2005, meaning that all his claims associated with that fall and injury expired in 2007.  The alleged examination of his wrist by Jane Doe, and Fuentes's allegedly negligent assessment of Plaintiff's first x-ray, occurred in 2005 to 2006.  Since the Complaint includes no statement suggesting fraudulent concealment

by Jane Doe or Fuentes, these claims expired in 2008.
Plaintiff's claim against Ricci based on his complaining to her
about the gym floor arose from the events which, allegedly, took
place in mid-2006 and, thus, also expired in 2008.

The claims against Schliftman and Martin stem from an x-ray
performed in 2006, wherein Plaintiff concedes that Schliftman and
Martin arrived at the correct diagnosis (but maintains that they
erroneously did not direct an MRI). Even if Plaintiff's claims
had merit, those claims expired in 2008, and no statement made in
the Complaint suggests that Schliftman and Martin fraudulently
concealed their medical findings from Plaintiff. Furthermore,
even if fraudulent concealment of Plaintiff's diagnosis could,
somehow, be read into the actions of John Doe, Plaintiff's claim
accrued when he was expressly informed about the nature of his
injury by Ivey, during her 2008 examination of the wrist. Thus,
all of Plaintiff's claims associated with his injury and
allegedly undue treatment that had taken place until Ivey's
examination expired by 2010.

All of Plaintiff's claims associated with the surgery of his
wrist, conducted in 2008, also expired in 2010. Moreover, all of
Plaintiff's claims associated with his next x-ray (assessed by
Ivey in January 2009), his requests for physical therapy that
were made after surgery, and his allegations based on Glick's
removal of Plaintiff's post-surgical cast (ensuing from the
events of April or May of 2009) also expired before or in May of

2011, i.e., prior to June 22, 2011, which is the date asserted by Plaintiff as the date of his filing of the suit in a state forum. Correspondingly, all of these claims are untimely and must be dismissed.  Plaintiff's claim that he did not "discover" his injuries until September 2009 (see dkt. entry no. 1-1, ¶ 78), is without merit, since the Complaint shows that he was well aware of his injury since 2005, was apprised of the nature of this injury since 2008 at the latest, and sought physical therapy in 2008.  While Plaintiff asserts that Defendants committed fraud, the Complaint shows, in the clearest terms, that no fraudulent action took place.

The only claims that do not appear facially untimely are: (a) Ivey's allegedly erroneous conclusion, conveyed to Plaintiff through Brown, that Plaintiff needed no physical therapy; (b) Ahsan's execution of a diagnostic report on the basis of Plaintiff's September 2009 x-ray;[2] (c) Holmes's response to Plaintiff's grievance;[3] (d) Plaintiff's receipt of over-the-counter pain medication without clarification as to potential side effects of these medications;[4] and (e) Ahsan's

---

[2] As noted supra, Plaintiff concedes that Ahsan's diagnosis was correct.

[3] As noted supra, Plaintiff concedes that the statements made by Holmes were factually correct at the time of Holmes's execution of his response to Plaintiff's grievance.

[4] As noted supra, Plaintiff did not identify the individuals who dispensed these medications.

recommendation to Plaintiff to reduce consumption of these medications in the event Plaintiff observed certain side effects.

### C.   Substantive Insufficiency of Constitutional Claims

Even if the Court were to factor out the untimeliness of Plaintiff's constitutional claims, the allegations fail to state a claim upon which relief can be granted.  The claims against DOC must be dismissed since it is not a "person" subject to liability under § 1983.  See Grabow v. S. State Corr. Fac., 726 F.Supp. 537, 538-39 (D.N.J. 1989) (correctional facility not a person under § 1983).  Therefore, even if Plaintiff's claims against the DOC were timely, they would still be subject to dismissal.

The claims against UMDNJ, CMS, Lanigan, and Ricci are based solely on respondeat superior; the complaint makes it evident that these defendants had no personal involvement in the condition of the floor or in diagnosing Plaintiff's injury, or in the medical treatment provided to him or allegedly withheld. Therefore, these claims are also subject to dismissal.

Absent a state's consent, the Eleventh Amendment bars federal suits for money damages against state officers in their official capacities, see Kentucky v. Graham, 473 U.S. 159, 169 (1985), and – in addition – supervising officials cannot be held liable for actions of their subordinates unless the litigant asserts facts showing personal involvement by the supervisors in the alleged wrongs.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978);

Rizzo v. Goode, 423 U.S. 362 (1976); Durmer v. O'Carroll, 991
F.2d 64, 69 n.14 (3d Cir. 1993). Correspondingly, claims against
supervisors are subject to dismissal if based solely on the
respondeat superior theory. See Natale v. Camden Cnty. Corr.
Fac., 318 F.3d 575, 584 (3d Cir. 2003). Thus, even if Plaintiff's
constitutional claims against UMDNJ, CMS, Lanigan and Ricci were
timely, the Court would still be constrained to dismiss them.

   The claims against Voss, Nwachukwu, Howell and John/Jane
Does (other than Jane Doe who informed Plaintiff, in 2005, that
his wrist had to be x-rayed to be diagnosed and John Doe who, in
2008, recommended Plaintiff to apply ice to his wrist to reduce
the pain) are subject to dismissal for failure to assert personal
involvement in the alleged events. A defendant in a civil rights
action must have personal involvement in the alleged wrongs to be
held liable. See Baraka v. McGreevey, 481 F.3d 187, 210 (3d Cir.
2007). Consequently, even if Plaintiff's claims against Voss,
Nwachukwu, Howell and John/Jane Does were instituted in a timely
fashion, they would still be dismissed. Also, the allegations
against Fuentes, Martin, Schliftman, Ahsan, Ivey, Brown, and
Glick fail to state a claim of any constitutional magnitude.

   The Eighth Amendment proscription against cruel and unusual
punishment requires that prison officials provide inmates with
adequate medical care. See Estelle, 429 U.S. at 103-04. To set
forth a cognizable claim for a violation of this right, an inmate

must allege: (1) a serious medical need; and (2) behavior on the
part of prison officials that constitutes deliberate indifference
to that need. See id. at 106.  To satisfy the first prong of the
Estelle inquiry, the inmate must demonstrate that the medical
needs are serious.  "Because society does not expect that
prisoners will have unqualified access to health care, deliberate
indifference to medical needs amounts to an Eighth Amendment
violation only if those needs are 'serious.'"  Hudson v.
McMillian, 503 U.S. 1, 9 (1992).  Serious medical needs include
those that have been diagnosed by a physician as requiring
treatment or are so obvious that a lay person would recognize the
necessity for a doctor's attention, and those conditions which,
if untreated, would result in lifelong handicap or permanent
loss.  See Monmouth Cnty. Corr. Inst'l Inmates v. Lanzaro, 834
F.2d 326, 347 (3d Cir. 1987).  The seriousness of an inmate's
medical need may also be determined by reference to the effect of
denying the particular treatment.  See id.  For example, if
"unnecessary and wanton infliction of pain" results as a
consequence of a prolonged denial or delay in the provision of
adequate medical care, the medical need is of the serious nature
contemplated by the Eighth Amendment.  See Estelle, 429 U.S. at
105.  In addition, where denial or delay causes an inmate to
suffer a lifelong handicap or permanent loss, the medical need is
considered serious.  See, e.g., Archer v. Dutcher, 733 F.2d 14,

19

16 (2d Cir. 1984) (pregnant inmate who miscarried stated cognizable claim where she alleged that defendants intentionally delayed emergency medical aid for months).  Hence, a medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." Lanzaro, 834 F.2d at 347.

"Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Furthermore, deliberately delaying a necessary medical diagnosis for a long period of time in order to avoid providing care constitutes deliberate indifference that is actionable.  See Durmer, 991 F.2d at 67-69.  Deliberate indifference is also evident where officials erect arbitrary and burdensome procedures that result in interminable delays that deny medical care to suffering inmates. See Lanzaro, 834 F.2d at 346-47.  However, inconsistencies or differences in medical diagnoses, short delays unaccompanied by arbitrary or unduly burdensome bureaucratic procedures, refusal to consider an inmate's self-diagnoses, to summon the medical specialist of the inmate's choice, or to perform tests or

20

procedures that the inmate desires, to explain to the inmate the reason for medical action or inaction, or to train the inmate to perform medical procedures cannot amount to cruel and unusual punishment.  See White v. Napoleon, 897 F.2d 103 (3d Cir. 1990) (mere disagreement over medical judgment or treatment not an Eighth Amendment claim); Alsina-Ortiz v. Laboy, 400 F.3d 77 (1st Cir. 2005) (doctor's failure to respond to inmate's certain request for services, in context of doctor's continued and regular services, did not deprive inmate of meaningful treatment); Smith v. Sator, 102 Fed.Appx. 907 (6th Cir. 2004) (where prisoner alleged that defendants did not provide various specialized medical tests that prisoner found to be necessary based on his reading of medical literature, the complaint was frivolous because refusal to provide specialized tests amounted to nothing more than difference of opinion regarding medical diagnosis and treatment and did not rise to level of Eighth Amendment violation); Lopez v. Kruegar, 1990 U.S. Dist. LEXIS 6808 (E.D. Pa. June 4, 1990) (where plaintiff stated that he was receiving medication but felt that additional medical tests should be taken, his allegations were directed at wisdom or quality of treatment and did not state claim).

Plaintiff's claims here against Fuentes, Schliftman, Martin, Ahsan, Ivey, Brown, and Glick are not of a constitutional magnitude.  Even if the Court were to hypothesize that Plaintiff's hairline fracture amounted to a serious medical need, the actions

of these Defendants did not rise to the level of deliberate indifference.  Indeed, the Complaint evinces continuous treatment of Plaintiff's injury, and Fuentes's allegedly erroneous reading of the first x-ray, Ivey's observation that the wrist did not require post-surgical physical therapy, or Ahsan's recommendation to reduce intake of pain relievers if Plaintiff suffered from side effects could, at most, qualify as negligence.[5]

Moreover, Glick's act of speculating about what should or should not have been done by other medical practitioners, or Brown's act of conveying Ivey's medical conclusions to Plaintiff were not actions allowing for finding of any liability.  Also, Ivey and Martin/Schliftman's correct readings of Plaintiff's x-rays simply were not acts of deliberate indifference.  Correspondingly, all of these constitutional claims are facially insufficient and will be dismissed.

**D.   Procedural Deficiency of State Law Claims**

While the above-discussed claims cannot serve as a basis for cognizable constitutional claims, those claims that are timely and allege negligent conduct could serve to support state law claims.  However, here, these claims are procedurally deficient on their face.

---

[5] Analogously, Plaintiff's allegations that an unspecified individual provided him with over-the-counter pain medication without informing him about potential side effects could amount, at most, to allegations of negligence.

22

The NJTCA governs tort claims against public entities and employees.  N.J.S.A. § 59:1-1 et seq.  See Velez v. City of Jersey City, 180 N.J. 284 (2004); Badalamente v. Monmouth Cnty. Prosecutor's Office, 2011 U.S. Dist. LEXIS 53457, at *25 (D.N.J. May 17, 2011).  A notice of claim must be filed with the public entity no later than the ninetieth day after accrual of the underlying cause of action.  See N.J.S.A. § 59:8-8(a).[6]  Failure to file the required notice will result in the dismissal of tort claims.  See N.J.S.A. § 59:8-3 ("No action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter").

It is undisputed that the Defendants at issue in these tort claims are public entities and employees and, therefore, the notice provisions of the NJTCA apply.  The complaint did not

---

[6] A "claimant shall be forever barred from recovering against a public entity or public employee if . . . [h]e failed to file his claim with the public entity within 90 days of accrual of his claim except as otherwise provided in section 59:8-9."  N.J.S.A. § 59:8-8.  The purpose of the notice requirement under N.J.S.A. § 59:8-8 is: "(1) to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit; (2) to provide the public entity with prompt notification of a claim in order to adequately investigate the facts and prepare a defense; (3) to afford the public entity a chance to correct the conditions or practices which gave rise to the claim; and (4) to inform the State in advance as to the indebtedness or liability that it may be expected to meet."  Moon v. Warren Haven Nursing Home, 182 N.J. 507, 514 (2005) (quoting Beauchamp, 164 N.J. 111, 121-22 (2000)) (quotes and cites omitted).

allege that he filed a notice in accordance with the NJTCA; moreover, his subsequent filings unambiguously (and repeatedly) indicated that no notice was filed.

But there is a limited exception to the 90-day requirement: where "extraordinary circumstances" exist for the claimant's failure to timely file and, in addition, defendants are not "substantially prejudiced" by such late filing.[7]

"Extraordinary circumstances" are determined by a court on a case-by-case basis. See Rolax v. Whitman, 175 F.Supp.2d 720, 730-31 (2001), aff'd, 53 Fed.Appx. 635 (2002); S.P. v. Collier High Sch., 319 N.J.Super. 452, 465 (N.J. App. Div. 1999).  In that regard, the purpose of the phrase "extraordinary circumstances" in the NJTCA is not to "relax" the standard but to "raise the bar for the filing of late notice from a 'fairly permissive standard' to a 'more demanding one.'"  Beauchamp, 164 N.J. at 118.[8]

---

[7] "A claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 of [the Act], may, in discretion of a judge . . . be permitted to file such notice at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby.  Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by section 59:8-8 of [the NJTCA] or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter."  N.J.S.A. § 59:8-9.

[8] Beauchamp explained that, "in determining whether a notice of claim under N.J. Stat. Ann. § 59:8-8 has been timely filed, a sequential analysis must be undertaken."  164 N.J. at 118.

Plaintiff's claims here kept accruing from 2005 to 2008, when Plaintiff first learned of his injury upon falling and having his wrist hurt, then upon learning the nature of his injury and getting recommendations to follow surgery with physical therapy. He faced no extraordinary obstacles: as the record shows, he swiftly filed a grievance against Ivey right after she informed him about her opinion that no physical therapy was needed and, just as swiftly, filed an administrative appeal once his grievance was denied.  The time-line of the events and Plaintiff's conduct indicates that, had he wished to commence a timely NJTCA claim by filing his notices of claim, he could have easily done so. However, he elected to sit on his rights for months and even years.  Granting him an opportunity to file his notice of claim now would fly in the face of both the letter and spirit of relevant state law.  Therefore, Plaintiff's application for filing his notice of claim out of time will be denied, and these state law challenges will be dismissed as procedurally defective.

---

First, the court must determine when the claim accrued.  "The discovery rule is part and parcel of such an inquiry because it can toll the date of accrual."  Id.  Once the date of accrual is ascertained, the court must then determine whether a notice of claim was filed within ninety days.  See id.  If not, the court must then decide whether extraordinary circumstances exist justifying a late notice.  See id.  Importantly, "[i]t is a common and regrettable occurrence for accrual and extraordinary circumstances to be treated as interchangeable and for courts and litigants to overlook the primary question of accrual and directly confront the ultimate question of extraordinary circumstances.  What is important is to understand the framework of a Tort Claims notice analysis and to follow it."  Id.

### E.   Residual Determinations

The Court has no reason to grant Plaintiff's application for remand.  Defendants' removal of the action was proper.  Plaintiff chose to include federal claims in the Complaint, thus providing Defendants with a basis for removal.

## V.   CONCLUSION

The Complaint will be dismissed with prejudice as to all claims related to all events other than the alleged denial of a "soft cuff" in November 2010, the current denial of a support wrap, and the current condition of the gym floor.  Those three aforementioned lines of allegations will be dismissed without prejudice, pursuant to Rules 18 and 20, and Plaintiff can, if he so desires, raise these challenges by means of a new and separate complaint filed in the forum of his choice.  The Court will issue an appropriate order and judgment.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated:  June 13, 2012